UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| CLARA LeBEAU, as Administrator of the Estate of Andrea Circle Bear, a/k/a "Andrea High Bear," deceased,<br><br>               Plaintiff,<br><br>   vs.<br><br>UNITED STATES OF AMERICA,<br><br>               Defendant. | 4:23-CV-04038<br><br>MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS |

Pending before the Court is Defendant's motion to dismiss Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (Doc. 5). Defendant's motion was originally filed on May 16, 2023, and this Court reserved ruling on Defendant's motion pending jurisdictional discovery. (Doc. 31). Additionally, the Court granted Plaintiff leave to amend her complaint. (*Id.*). Following jurisdictional discovery and several motions to extend deadlines, Plaintiff filed an amended complaint (Doc. 50), and the parties submitted their findings regarding the outstanding jurisdictional issues. (Docs. 51; 56; 58; 59). The Court also held oral argument on the question of jurisdiction on January 7, 2025. (Doc. 57). For the following reasons, the Court grants in part and denies in part Defendant's Motion to Dismiss.

## I.    FACTUAL BACKGROUND

The present case stems from the tragic death of Andrea Circle Bear while in federal custody. (Doc. 50-1, Amended Complaint). Plaintiff, Clara LeBeau, is the grandmother of the decedent, Andrea Circle Bear, and the great grandmother and caretaker of Ms. Circle Bear's six

1

minor children. (*Id.*). Ms. LeBeau serves as the administrator of the decedent's estate. (Doc. 50-2, Order Appointing Administrator). Plaintiff's claims are for negligence and wrongful death pursuant to 28 U.S.C. §§ 1346(b) and 2674 of the Federal Tort Claims Act ("FTCA"). (Doc. 50-1, Amended Complaint). Count I alleges that the Government breached its duty of care when it decided to transfer Ms. Circle Bear from Winner City Jail, in Winner, South Dakota to Federal Medical Center, Carswell ("FMC Carswell"), in Fort Worth, Texas; Count II alleges negligence and wrongful death in connection with the manner Ms. Circle Bear was transferred and the conditions of FMC Carswell upon her arrival; and Count III alleges negligence and wrongful death regarding Defendant's failure to provide adequate medical care to Ms. Circle Bear at FMC Carswell. (*Id.* at 807-811).

On October 7, 2019, Ms. Circle Bear pleaded guilty to maintaining a drug-involved premises and was sentenced to 26 months imprisonment on January 14, 2020. (*Id.* at 786). At the time of sentencing, she was six months pregnant, and her pregnancy was deemed "extremely high risk" because her previous five children were all delivered by caesarian section. (*Id.*). During the sentencing proceeding, the presiding Judge recommended that Ms. Circle Bear be incarcerated FMC Carswell. (*Id.*). It was also recommended that Ms. Circle Bear be permitted to participate in the Federal Bureau of Prisons ("BOP") substance abuse treatment plan. (Doc. 6 PgID 72). Beginning on February 6, 2020, Ms. Circle Bear was being held in the Winner City Jail, with her medical care being handled in Winner and Pierre, South Dakota. (Doc. 50-1, Amended Complaint PgID 786). At that time, she planned to deliver her baby by caesarian section at St. Mary's Hospital in Pierre, South Dakota. (*Id.*, at 787).

As with all newly sentenced inmates, the BOP conducted an initial review of Ms. Circle Bear to determine her designation. (Doc. 58-2, Beardsley Deposition PgID 1164-65). This initial

review is based on various documents including the pre-sentence investigation report, medical records, and other documents provided by the United States Marshals Service ("USMS"). (*Id.*). Here, because of Ms. Circle Bear's medical conditions, the BOP referred her file to Captain Susan Beardsley, a Medical Designator for the BOP, to conduct a more thorough medical review of Ms. Circle Bear. (*Id.* at PgID 1165). Each inmate that undergoes a medical designation is assigned a care level of 1-4. (Doc. 11-1, Beardsley Declaration PgID 123). Each BOP institution is also assigned a care level, and medical designators are responsible for matching an inmate's care level with a corresponding institution capable of meeting their medical needs. (*Id.*). Based on Capitan Beardsley's review, she categorized Ms. Circle Bear as a screen Care Level 4 medical and screen Care Level 2 mental health. (*Id.* at 125). FMC Carswell is the only federal medical referral center for female inmates who require a medical or mental health Care Level of 3 or 4. (*Id.* at 124). Accordingly, Capitan Beardsley initially designated Ms. Circle Bear to FMC Carswell. (*Id.* at 125).

On March 3, 2020, pursuant to the initial designation, the BOP formally designated Ms. Circle Bear for transfer to FMC Carswell. (Doc. 50-1, Amended Complaint PgID 789-90). On March 20, 2020, Ms. Circle Bear was transferred by plane to FMC Carswell along with three other prisoners and four USMS employees. (*Id.*). Within 72 hours of transporting Ms. Circle Bear, a physician cleared her to fly, and immediately before boarding the aircraft, the plane was sanitized, and the passengers were screened for COVID-19 symptoms. (Docs. 58-1, Wykert Deposition; 58-7, Coffey Deposition). On March 13, 2020, between her formal designation and her transfer, the BOP implemented several new policies limiting inmate movement as part of its COVID-19 response. (Doc. 50-1, Amended Complaint PgID 788).

3

Ms. Circle Bear arrived at FMC Carswell on March 20, 2020, and immediately underwent an intake screening as well as a medical history review and a physical. (Doc. 58-6, Smith Deposition). Following the screening, Ms. Circle Bear was placed in a quarantine cell with one other inmate with whom she was transported with. (Docs. 9; 58-7, Coffey Deposition). By March 26, 2020, Ms. Circle Bear had developed a dry cough, shortness of breath, and muscle aches. (Doc. 50-1, Amended Complaint at 801). Two days later, on March 28, 2020, she registered a fever of 100.3°F and was seen by Dr. Ryan Whitmer. (*Id.* at 802). Dr. Whitmer noted that she appeared ill, and she was sent to John Peter Smith Hospital (JPS), a level one trauma center, and returned to FMC Carswell that same evening. (*Id.* at 801-802). Upon her return, she registered a fever of 100.9°F and was seen by Dr. Jason Miller. (*Id.* at 802). Dr. Miller noted in her file and communicated to FMC Carswell medical staff that Ms. Circle Bear should be under close supervision, and that if her symptoms worsened, she should be immediately sent back to JPS. (*Id.*).

On the morning of March 29, 2020, Ms. Circle Bear continued to complain of a cough, and the following afternoon, March 30, 2020, was seen by Dr. Janet Shackleford who noted that Ms. Circle Bear had a severe cough and a fever of 100.5°F. (*Id.* at 803). That evening, Ms. Circle Bear complained of nausea, vomiting, and feeling feverish. (*Id.*). On the evening of March 30, 2020, Ms. Circle Bear registered a fever of 102°F, and at that time was seen by Dr. Mathew Rios. (*Id.*). On the morning of March 31, 2020, Dr. Shackleford saw Ms. Circle Bear and again noted a severe cough, and later that afternoon, Ms. Circle Bear was transported back to JPS. (*Id.*). Shortly after her arrival, she was assigned to the intensive care unit, intubated, and placed on a ventilator. (*Id.* at 804). While she was in an induced coma, doctors performed an emergency caesarian section on April 1, 2020, and successfully delivered a baby girl. (*Id.*). On April 4th, 2020, the results of a

COVID-19 test taken on March 31, 2020, showed that she was positive for COVID-19. (*Id.*). Ms. Circle Bear remained in a coma and died on April 28, 2020. (*Id.*).

Ms. LeBeau brought this action on March 15, 2023, alleging negligence and wrongful death pursuant to the FTCA. Plaintiff alleges that the decision to transfer Ms. Circle Bear from South Dakota to Texas along with the manner she was transferred, exposed her to an unnecessary risk of contracting COVID-19 and was contrary to then existing USMS and BOP policies restricting inmate movement. (*Id.* at 807-808). Plaintiff further alleges that, upon her arrival at FMC Carswell, Ms. Circle Bear was housed in over-crowded, unsafe, and unsanitary conditions, which ultimately led to her contracting COVID-19. Finally, Plaintiff alleges that after Ms. Circle Bear contracted COVID-19, Defendant failed to provide adequate medical care when the employees at FMC Carswell did not timely diagnose and treat her COVID-19 symptoms despite knowing of her high-risk status.

The Government has moved to dismiss Plaintiffs claims, alleging both lack of subject matter jurisdiction under F.R.C.P. 12(b)(1), and failure to state a claim upon which relief can be granted under F.R.C.P. 12(b)(6). Fed. R. Civ. P. 12(b)(1) and (b)(6). The Government relies on its Motion to Dismiss and supporting briefs already before the Court and argues that a factual challenge pursuant to F.R.C.P. 12(b)(1) mandates dismissal of Counts I and II under the discretionary function exception to the FTCA. (Docs. 5; 6; 28; 51; 58). That is, in the Government's view, the decision to transport Ms. Circle Bear from South Dakota to Texas, the manner in which she was transported, and how she was housed at FMC Carswell fall within the discretionary function exception. (Doc. 58). With respect to Count III, the Government argues that Tex. Civ. Prac. & Rem. Code Ann. § 74.155 shields it from liability, and thus should be dismissed pursuant Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*Id.*).

5

Plaintiff contends that the discretionary function exception does not apply to Counts I and II because Defendants have violated the Constitution[1], federal statutes, and agency policy. (Docs. 24; 56; 59). Plaintiff further contends that the Texas pandemic-immunity law does not apply here, because the misconduct alleged is beyond the scope of its protections and that it was improperly raised at the pleading stage. (*Id.*).

As mentioned above, the Court permitted the parties to conduct jurisdictional discovery and present its findings to the Court. (Doc. 31). Following discovery, the Parties have supplied information surrounding the COVID-19 pandemic, and, pertinent to the issues in the motion, the BOP Phase Two COVID-19 Action Plan (updated March 19, 2020), the USMS policy directives regarding inmate transfer, restraints, and detention, the USMS COVID-19 Detention Guidance, the CDC Interim Guidance on the Management of COVID-19 in Prisons, a Department of Justice Office of the Inspector General ("OIG") report on the USMS and BOP's COVID-19 policies, medical records of Ms. Circle Bear while at FMC Carswell, and several deposition excepts and affidavits. (Docs. 51; 56; 58; 59).

## II.     DISCUSSION

### A. Legal standard

#### 1. Motion to Dismiss for a Lack of Subject-Matter Jurisdiction—12(b)(1)

Federal courts are, by design, courts of limited jurisdiction, possessing only the jurisdictional authority granted by the United States Constitution and Congress. *Spreitzer Properties, LLC v. Travelers Corp.*, 599 F.Supp.3d 774, 778-9 (D. Iowa 2022); *see also Marine*

---

[1] Although Plaintiff has made clear that she is not asserting an Eighth amendment claim under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), Plaintiff contends that because the conduct alleged in Counts I and II also constitute cruel and unusual punishment in violation of Ms. Circle Bear's Eighth Amendment right, the discretionary function exception is inapplicable.

*Equipment Mgmt. Co. v. United States,* 4 F.3d 643, 646 (8th Cir. 1993) (stating that federal courts "have only the power that is authorized by Article III of the Constitution and statutes enacted by Congress pursuant thereto."). In every federal case, "the threshold inquiry... is whether the court has jurisdiction" and the Eighth Circuit has directed "district judges to be attentive to a satisfaction of jurisdictional requirements in all cases." *Flandreau Santee Sioux Tribe v. United States,* 565 F.Supp.3d 1154, 1163 (D.S.D. 2021) (quoting *Winnebago Tribe of Neb. v. Babbitt,* 915 F.Supp.157, 162 (D.S.D. 1996)). When deciding a motion to dismiss under Rule 12(b)(1), a court "must distinguish between a 'facial attack' and a 'factual attack.'" *Carlsen v. GameStop, Inc.,* 833 F.3d 903, 908 (8th Cir. 2016) (quoting *Osborn v. United States,* 918 F.2d724, 728 n.6 (8th Cir. 1990)). In a "facial attack," the Court is confined to "the complaint alone or on undisputed facts in the record," *Harris v. P.A.M. Transp., Inc.,* 339 F.3d 635, 637 (8th Cir. 2003), and "the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Carlsen,* 833 F.3d at 908 (quoting *Osborn,* 918 F.2d at 728 n.6).

In a "factual attack" on the other hand, "the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* Further, when "a district court engages in a factual review, it inquiries into and resolves factual disputes." *Faibisch v. Univ. Minnesota,* 304 F.3d 797, 801 (8th Cir. 2002). Even though the court is considering matters outside the pleadings, this does not "convert the 12(b)(1) motion to one for summary judgment." *Harris,* 339 F.3d at 637 n.4.

> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

7

*Osborn*, 918 F.2d at 730. Plaintiff, as the party invoking jurisdiction, has the burden to establish it over each claim it is asserting. *See Bourassa v. United States*, 581 F.Supp.3d 1188, 1193 (D.S.D. 2022) (citing *Green Acres Enters., Inc. v. United States*, 481 F.3d 852, 856 (8th Cir. 2005)). The government characterized its motion to dismiss Counts I and II as a "factual attack," and rightfully so, as the parties have conducted jurisdictional discovery and submitted several documents outside the pleadings for the Court to consider in its jurisdictional analysis.

### 2. Motion to Dismiss for a Failure to State a Claim—12(b)(6)

To avoid dismissal under Rule 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" such that the court may draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal* 556 U.S. 662, 678, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *See also Spagna v. Phi Kappa Psi, Inc.*, 30 F4th. 710, 715 (8th Cir. 2022) (dismissal proper where factual allegations failed to state a plausible claim for relief and amounted to only a possibility that relief was warranted). While this pleading standard does not require "detailed factual allegations," it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*, 556 U.S. at 678.

Unlike a 12(b)(1) "factual attack," in considering a motion to dismiss pursuant to 12(b)(6), a Court must assume all facts alleged in the complaint are true and construe all reasonable inferences most favorably to the non-moving party. *See Broin and Associates, Inc. v. Grenecor Intern.*, 232 F.R.D. 335, 338 (D.S.D. 2005) (citing *Frey v. Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)). However, the court need not "accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th

Cir. 2019) (citing *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999)). As a practical matter, "[a] motion to dismiss should be granted ... only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671.

When a court considers a motion to dismiss under Rule 12(b)(6), it examines the complaint and "'matters incorporated by reference or integral to the claim, subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned' without converting the motion into one for summary judgement." *Faloni and Associates, LLC v. Citibank N.A.*, No. 19-4195, 2020 WL 4698475, *2 (D.S.D. Aug. 13, 2020) (quoting *Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004))).

### 3. Federal Tort Claims Act—Discretionary Function Exception

As a general proposition, the United States may not be sued without its consent. *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 127 S.Ct. 996, 127 L.Ed.2d 308 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). The Federal Tort Claims Act ("FTCA"), provides a limited waiver of sovereign immunity in the following circumstances:

> civil actions on claims against the United States, for money damages,...for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). See also 28 U.S.C. § 2674. This waiver, however, is subject to various limitations and exclusions, including what is known as the "discretionary function exception" at

issue here. *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

The discretionary function exception provides that the Government is not liable for:

> [a]ny claim…based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The Eighth Circuit has made clear on numerous occasions that "[i]f the FTCA's discretionary function applies, it is a jurisdictional bar to suit." *Mound v. United States*, --- F.4th ---, 2023 WL 3911505, *1 (8th Cir. Jun. 9, 2023); *Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013); *Walters v. United States*, 475 F.3d 1137, 1139 (8th Cir. 2017). A well-established two-prong test applies to determine whether the discretionary function exception bars a party's suit under the FTCA. *See Two Eagle v. United States*, 57 F.4th 616, 623 (8th Cir. 2023). First, a court must determine "'whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being controlled by mandatory statutes or regulations.'" *Id.* (quoting *Buckler v. United States*, 919 F.3d 1038, 1045 (8th Cir. 2019)); *see also Gaubert*, 499 U.S. at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (explaining that this exception only covers "acts that 'involv[e] an element of judgment or choice,'" thus the first prong "is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'")).

If, on the other hand, there is no statute, regulation, or policy directing a specific course of action, and the employee's actions are "considered a product of judgment or choice," the first prong is satisfied. *Two Eagle*, 57 F.4th at 623. Under the second prong, courts consider "whether the government employee's judgment or choice was 'based on considerations of social, economic,

and political policy." *Buckler v. United States*, 919 F.3d 1038, 1045 (8th Cir. 2019); *see also Gaubert*, 499 U.S. at 323 (quoting *Varig Airlines*, 467, U.S. 797, 814 (1984); *Berkovitz*, 486 U.S. at 537) (reasoning that "the purpose of the exception is to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy.'"). Therefore, "when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Id.* Importantly, the focus of the second prong is not whether the particular government employee, in exercising his or her discretion, consciously engaged in policy-balancing, but whether the actions taken "are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Once it has been established that the regulatory scheme allows discretion, "a presumption arises that the discretion is grounded in policy considerations, and the plaintiff 'must rebut this presumption.'" *Buckler*, 919 F.3d at 1046 (quoting *Hernden v. United States*, 726 F.3d 1042, 1048 (8th Cir. 2013)).

### 4. Choice of Law

The FTCA provides that lawsuits within its purview are governed in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1). When an act or injury occurs in multiple jurisdictions, South Dakota applies the "significant relationship approach." *See Chambers v. Dakotah Charter, Inc.*, 488 N.W.2d 63, 67 (S.D. 1992) (adopting the approach in the Restatement (Second) of Conflict of Laws §§ 145 and 6 (1971)). This approach requires a consideration of several factors focusing on the contacts of the injured party to the possible sources of governing law. *Id.* at 68. In *Chambers*, the court cited the origin of the conduct at issue, domicile, residence, place of the relationship of the parties, economic impact of the lawsuit, and the fortuitous location of the injury as factors to consider. *Id.* In negligence cases—

11

including wrongful death—there is a starting presumption that the law of the state where the injury

occurred controls. *See Axline v. 3M Co.*, 8 F.4th 667, 673 (8th Cir. 2021).

> Indeed, the Restatement with respect to wrongful death provides:

> The local law of the state where the injury occurred is most likely to be applied when the decedent had a settled relationship to that state, either because he was domiciled or resided there or because he did business there. When, however, the decedent was domiciled or resided or did business in the state where the conduct occurred, this state is more likely to be the state of most significant relationship and, therefore, the state of the applicable law with respect to issues that would usually be determined by the local law of the state of injury.

Restatement (Second) of Conflict of Laws § 175 (1971).

### B. Analysis

In this Court's order of November 9, 2023, it reserved ruling on Defendant's motion to

dismiss Counts I and II under Rule 12(b)(1) on the basis that the challenged conduct is shielded

by the discretionary function exception. (Doc. 31). Further, while the Court held that Texas law

will apply to Counts II and III, it reserved ruling on whether South Dakota or Texas law will apply

to Count I. (*Id.*). Finally, the Court also reserved ruling on Defendant's motion to dismiss Count

III under Rule 12(b)(6) on the basis that the claim is barred by Texas law. (*Id.*). The Court will

now rule on the outstanding issues.

As an initial matter, Plaintiff claims that the government has belatedly changed its theory

from a facial attack to a factual attack with respect to the Eighth Amendment issue, and that the

Court should analyze the Eighth Amendment issue under the more lenient 12(b)(6) standard.

(Docs. 56; 59). Contrary to Plaintiff's argument, however, the government has consistently

asserted that it is making a factual challenge to the Court's jurisdiction under 12(b)(1). *See* (Doc.

6 PgID 66) ("[T]he United States makes a *factual challenge* to Plaintiff's complaint."); (Doc. 28

PgID 712) ("[T]he United States makes a *factual challenge* to the Court's jurisdiction under

12(b)(1)"); (Doc. 51 PgID 885) (arguing that the *factual allegations*, even if accepted as true under a 12(b)(6) standard, do not establish an Eighth Amendment violation.); (Doc. 58 PgID 1106) ("When the moving party makes a *factual attack*…as the Government did here."). The Court granted Plaintiff the opportunity to conduct jurisdictional discovery, and the parties have submitted several voluminous documents outside the pleadings including deposition excerpts, affidavits, medical records, and various USMS and BOP COVID-19 policies for the Court to consider in its jurisdictional analysis. The overarching question before the Court regarding Counts I and II is its very power to hear the case, and "there is substantial authority that the trial court is free to weigh evidence and satisfy itself as to the existence of its power to hear the case." *Osborn*, 918 F.2d at 730. Plaintiff has made clear that she is not asserting a *Bivens* claim and is not alleging that the Eighth Amendment itself provides a basis for liability. (Doc. 59). Instead, Plaintiff contends that because the conduct alleged in Counts I and II violated Ms. Circle Bear's Eighth Amendment rights, the discretionary function exception is inapplicable. (*Id.*). Thus, at its core, the Eighth Amendment issue is a jurisdictional question, and Plaintiff cannot circumvent that question now and limit the Court's analysis to the complaint alone by belatedly asserting that the government has actually made a facial challenge to the Court's jurisdiction. The Court will proceed with a (12)(b)(1) factual review on the issue of its jurisdiction over Counts I and II.

### 1. Count I—Decision to transfer Ms. Circle Bear to FMC Carswell

Before the Court addresses the jurisdictional issues, it will decide whether South Dakota or Texas law applies to Count I. In cases of wrongful death, there is a starting presumption that the law of the state where the injury occurred controls. *See Axline*, 8 F.4th at 673. Ms. Circle Bear did not have any "settled relationship" with Texas. She was incarcerated and sentenced in South Dakota with recommendations that she be housed in FMC Carswell in Texas. She was eventually

transferred to FMC Carswell and was in BOP custody in Texas at the time of her death. On the other hand, however, Ms. Circle Bear was domiciled in South Dakota at the time of her death, and South Dakota is where much of the initial conduct occurred. After sentencing, the probation officers in South Dakota would have been in contact with the BOP regarding placement. The initial incarceration was in South Dakota. The boarding of the plane was in South Dakota. The four US Marshals accompanied the prisoners from South Dakota, and she was then flown to Texas. Therefore, the court will apply South Dakota law to Count I.

Under South Dakota Law, "[a] health care provider is not liable for any damages for causing or contributing, directly or indirectly, to the death or injury of a person as a result of the health care provider's acts or omissions in response to COVID-19." SDCL § 21-68-4. That said, for the purposes of Count I, the BOP employees designating prisoner placement and other federal employees including the Marshals who carried out the transportation are not heath care providers as defined in § 21-68-1, and thus it is not applicable to the conduct alleged in Count I. The entire Federal government is not a health care provider. The federal government is a "healthcare provider" when its employees provide healthcare services, however, this was not the case with regards to the conduct alleged in Count I. Accordingly, the Court finds that the South Dakota COVID-19 immunity statute is inapplicable to Count I.

As mentioned above, Plaintiff argues that the discretionary function exception is inapplicable to Count I because the decision to transfer Ms. Circle Bear violated the Constitution, federal statutes, and then existing USMS and BOP policy. Defendant contends that Plaintiff has failed to plausibly allege a Constitutional violation. The Government further contends that the relevant federal statutes and agency policies permit discretion and that the decision to transfer Ms. Circle Bear was a permissible exercise of their discretion. The Court will address each in turn.

### a. Deliberate indifference

A majority of circuits, including the Eighth Circuit, have held that the discretionary function exception does not apply when the "conduct that a plaintiff plausibly alleges also flouts a constitutional prescription." *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) (stating that at least seven circuits have recognized that "the discretionary-function exception does not shield government officials from FTCA liability when they exceed the scope of their constitutional authority."); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (concluding the challenged conduct fell outside the discretionary function exception because the plaintiff plausibly alleged constitutional violations.); *Nieves Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021) (reasoning that even if the regulatory scheme permitted discretion, "agents do not have discretion to violate the constitution.").

Plaintiff asserts that the Government violated Ms. Circled Bear's Eighth Amendment rights by acting with deliberate indifference to Ms. Circle Bear's medical needs when it decided to transfer Ms. Circle Bear from Winner City Jail to FMC Carswell. Plaintiff claims that transferring Ms. Circle Bear exposed her to an unnecessary and substantial risk of harm relative to her risk level had she stayed in South Dakota. Plaintiff alleges that FMC Carswell was overcrowded, did not have adequate protections in place, and COVID-19 was far more prevalent in Texas than in South Dakota. In contrast, Plaintiff asserts that at Winner City Jail, Ms. Circle Bear's medical condition was stable, she had plans to deliver her baby at St. Mary's Hospital in Pierre, and that she was tucked away from the worst of the pandemic. Defendant argues that based on the information available to the BOP and USMS at the time of Ms. Circle Bear's designation and transport, they believed FMC Carswell to be better situated not only to provide medical care, but also to limit her contact with COVID-19.

A prison official's deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Alberson v. Norris,* 458 F.3d 762, 765–66 (8th Cir. 2006). "A prison official is deliberately indifferent if he 'knows of and disregards' a serious medical need or a substantial risk to an inmate's health or safety." *Nelson v. Correctional Medical Services,* 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). This is a stringent standard of fault that includes both an objective and a subjective prong. *Saylor v. Nebraska,* 812 F.3d 637, 644 (8th Cir. 2016). A plausible claim for deliberate indifference requires a plaintiff to demonstrate "'that [s]he suffered from an objectively serious medical need' and 'that [Defendants] actually knew of but deliberately disregarded [her] serious medical need.'" *Id.* (quoting *Scott v. Benson,* 742 F.3d 335, 340 (8th Cir.2014). A medical need is "objectively serious" if it has been "diagnosed by a physician as requiring treatment" or is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Scott,* 742 F.3d at 340 (quoting *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir.1997)). In the present case, Ms. Circle Bear clearly had an "objectively serious" medical need. Indeed, Ms. Circle Bear's own physician as well as Captain Beardsley agreed that her pregnancy was "extremely high risk." The sentencing Judge also noted her high-risk pregnancy when recommending that she serve her time at FMC Carswell. We focus, then, on the subjective prong.

Under the subjective prong, Plaintiff must show that the Government knew of but deliberately disregarded either an "existing serious medical need" or "conditions posing a substantial risk of serious future harm." *Shipp v. Murphy,* 9 F.4th 694, 703 (8th Cir. 2021) (internal quotation marks omitted) (quoting *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir. 1995)). This "is an extremely high standard" which requires a showing of "'more than negligence, more than even

gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).    Deliberate indifference requires a mental state "akin to criminal recklessness." *Id.*  When evaluating whether an actor deliberately disregarded a risk, we consider "his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000).    We must avoid determining the question "with hindsight's perfect vision." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998).

In the instant case, the USMS and BOP knew of and recognized that Ms. Circle Bear's pregnancy was considered extremely high risk, that COVID-19 was beginning to spread across the United States, and that pregnant women are more susceptible to viral infections.  Thus, the question before the Court is whether the USMS and the BOP—in deciding to transfer Ms. Circle Bear in light of the known risks—acted with "more than gross negligence."  The Court finds that proceeding with the transfer in light of the known risks and information available at the time does not rise to more than gross negligence.  The Court makes no other finding as to any degree of negligence.

As with all newly sentenced inmates, the BOP conducted a review of Ms. Circle Bear's file to determine her designation.  Here, because of Ms. Circle Bear's medical condition, the BOP also conducted a medical review of Ms. Circle Bear.  Based on the medical review, the BOP classified Ms. Circle Bear as Care level 4 medical status and she was designated to FMC Carswell. FMC Carswell is the only federal medical facility for Care Level 4 female inmates and is specifically designed to address the needs of pregnant women and their babies, both before and

after delivery. An email correspondence between FMC Carswell and the USMS indicated that FMC Carswell was nearing capacity, however, prison staff were able to house her with only one other inmate in a cell designed for four inmates. Further, despite Plaintiff's claims that Ms. Circle Bear was sheltered from the pandemic in Winner, at the time of her designation and transfer on March 20, 2020, there were confirmed cases of COVID-19 in both South Dakota and Texas. That said, there were no confirmed cases of anyone in BOP or USMS custody, which includes FMC Carswell.

Plaintiff stresses that Ms. Circle Bear had birth plans in South Dakota, however "inmates have no constitutional right to receive a particular or requested course of treatment." *Cannon v. Dehner*, 112 F.4th 580, 587 (8th Cir. 2024) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1242 (8th Cir. 1997) (quotation omitted). Furthermore, the medical classification of inmates, and determinations of transporting inmates are discretionary decisions. *See Dudley v. United States*, No. CIV 09-4024-LLP, 2010 WL 5290024, at *3 (D.S.D. Dec. 17, 2010). Here, the decision to transfer Ms. Circle Bear was just that, a permissible exercise of agency discretion. Plaintiff argues that Ms. Circle Bear was safer at Winner City Jail, but FMC Carswell is staffed with medical personnel capable of delivering her baby, and JPS Hospital, a level one trauma center, is 9 miles away. Moreover, FMC Carswell had implemented some preventative COVID-19 measures including halting visitation, reducing the movement of prisoners in and out of the facility, and screening employees and newly-arriving inmates. FMC Carswell also had separate quarantine procedures in place for new inmates, symptomatic inmates, and close contacts. Winner City Jail did not have any quarantine policy, and St. Mary's Hospital, where Ms. Circle Bear has delivery arrangements, is 92 miles away.

During the early stages of COVID-19 the entire United States and most of the world, for that matter, attempted and failed to mitigate the spread of COVID-19. There was significant uncertainty and even disagreement among experts, scientists, and medical professionals regarding the transmission, treatment, and prevention of COVID-19. Of course, one could argue that the decision to transfer Ms. Circle Bear exposed her to a risk of contracting COVID-19, but one could also argue that leaving her in an ill-equipped local jail 92 miles from where Ms. Circle Bear had delivery arrangements, would have been equally—if not more—risky. Based on the information available to the BOP and USMS at that time, the Court cannot conclude that the USMS and BOP subjectively knew that Ms. Circle Bear was safer in Winner City jail, yet nonetheless decided to transfer her to FMC Carswell. To the contrary, the evidence shows that FMC Carswell was better equipped to handle Ms. Circle Bear's medical needs and had implemented COVID-19 measures which were not yet implemented at Winner City Jail. Even though better equipped, whether FMC Carswell carried out its obligations to Ms. Circle Bear will be determined under Count III. The present case is a tragic situation, and it is easy to look back through the lens of hindsight and critique the decision to transfer Ms. Circle Bear and hypothesize the different outcomes. However, the evidence does not show that by deciding to transfer and transferring Ms. Circle Bear, the USMS and BOP were more than grossly negligent in light of the risks and information available to them at that time. The Court makes no other finding as to any degree of negligence. Accordingly, the Court finds that Count I does not form the basis for a plausible claim of deliberate indifference in violation of the Eighth Amendment.

### b. Statutory violation under 18 U.S.C. § 4042(a)(2)-(3)

Plaintiff next argues that by transferring Ms. Circle Bear to FMC Carswell, the BOP did not comply with its statutory duties under § 4042(a)(2)-(3), and thus the discretionary function

19

exception is inapplicable. In relevant part, 18 U.S.C. § 4042 provides that the BOP shall "provide suitable quarters and provide for the safe keeping, care, and subsistence of all persons charged with or convicted of offenses against the United States," and "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

Plaintiff correctly points out that § 4042 sets forth various duties of the BOP, however, it does not prescribe a mandatory course of action as to how the BOP is to carry out those duties. Indeed, the plain language of the statute and judicial precedent from several courts, including the Eighth Circuit, make clear that the manner in which the BOP satisfies its statutory duties under § 4042 is discretionary, thus triggering the discretionary function exception. *See Muick v. Reno*, 83 Fed.Appx. 851, 853 (8th Cir. 2003) ("Muick's reliance on the BOP's general duty of care to safeguard prisoners under § 4042 is misplaced, because the provision reserves to the BOP sufficient discretion in how it fulfills its section 4042 duty to trigger the discretionary-function exception."); *Dudley*, 2010 WL 5290024, at *3 (holding that medical classification of inmates and institutions, as well as determinations of the method for transporting inmates, are discretionary decisions not subject to any specific mandate by § 4042); *Harlan v. United States*, No. 15-4046, 2016 WL 7015706, at *11 (D.S.D. Dec. 1, 2016) (holding that 18 U.S.C. § 4042(a)(2) does not dictate how a prison staffs dental services or provides dental care to inmates); *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) ("While it is true that this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."); *Cohen v. United States*, 151 F.3d 1338, 1342–

20

43 (11th Cir. 1998) ("§ 4042 leaves BOP personnel sufficient discretion about how their § 4042 duty of care is to be accomplished to warrant application of the discretionary function exception.").

Plaintiff concedes that the broad language of § 4042 provides the BOP with wide discretion in how it satisfies its obligations under the statute and does not attempt to rebut the presumption that the decision to transfer Ms. Circle Bear satisfies the second prong of the discretionary function exception test because it was based on "considerations of social, economic, and political policy." (Doc. 24 PgID 697) ("True, because § 4042(a)(2) and (3) are written in broad, general terms, the BOP has many ways to comply."). Instead, Plaintiff claims that by transferring Ms. Circle Bear to FMC Carswell, the government failed to make "a legitimate effort to carry out its mandatory duty "to provide "suitable quarters" and "provide for [her] protection," and thus the discretionary function exception is inapplicable. (*Id.* at 697-98) (citing *Hinsley v. Standing Rock Child Protective Services,* 516 F.3d 668, 672 (8th Cir. 2008); *Muick v. Reno*, 83 F. App'x 851, 853 (8th Cir. 2003) (per curiam); *United States v. Muniz*, 374 U.S. 150, 164-65, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963)). Plaintiff argues that because *Muick* holds § 4042 is not violated when the BOP attempts, but fails, to protect prisoners, § 4042 is violated when the BOP does not even attempt to fulfill its statutory duty. 83 F. App'x at 853. Plaintiff also relies on broad reading of *Muniz*, and argues that in some circumstances, a violation of § 4042 can vitiate the discretionary function exception. 374 U.S. at 164-65.

Even if the Court were to accept Plaintiff's interpretation of *Muick* and *Muniz*, the present facts do not support a finding that the BOP or USMS "failed to make legitimate effort" to carry out its duties under § 4042. As described at length above, the USMS and BOP transferred Ms. Circle Bear because in their discretion FMC Carswell was better situated not only to provide the medical care she needed, but also to limit her contact with COVID-19. The BOP transported her

21

on a direct flight to a well-equipped federal medical facility specifically designed to meet her needs. Whether that was ultimately the right decision is not for the Court to decide, but it certainly it qualifies as a "legitimate effort."

As is the case here, when a statute does not direct a specific course of action, and the employee's actions are "considered a product of judgment or choice," the discretionary function exception shields the government from liability "whether or not the discretion involved be abused." In carrying out its duties under § 4042, the USMS and the BOP exercised their discretion and decided to transfer Ms. Circle Bear to FMC Carswell. Of course they could have exercised their discretion differently, and it may or may not have led to a different outcome, however, it is precisely this sort of "judicial-second guessing of administrative decisions" that the discretionary function exception was designed to prevent. The Court finds that the decision to transfer Ms. Circle Bear to FMC Carswell was a permissible exercise of agency discretion and did not violate § 4042.

### c. BOP and USMS COVID-19 Policy

Lastly, Plaintiff argues that the discretionary function exception is inapplicable to Count I because the transfer of Ms. Circle Bear violated then existing BOP and USMS policy. In between the date of Ms. Circle Bear's formal designation on March 3, 2020, and her transfer on March 20, 2020, the BOP and USMS implemented several policies to limit inmate movement as part of its COVID-19 response. Plaintiff argues that the relevant COVID-19 policies mandated a specific course of performance and that the transfer of Ms. Circle Bear was contrary to the mandate.

The relevant policies are as follows. On March 13, 2020, the BOP, in coordination with the WHO, the CDC, and other agencies, implemented phase two of its COVID-19 action plan with the goal of mitigating the spread of COVID-19. Relevant to Count I, the BOP suspended "[a]ll

inmate facility transfers" for a period of 30 days. (Doc. 51-1, BOP COVID-19 Action Plan). Exceptions were permitted for "forensic studies, writs, Interstate agreements on Detainers, medical or mental health treatment, and release to pre-release custody." (*Id.*). Notably, however, the policy stated that "[a]dmission of new inmates will continue." (*Id.*). On March 18, 2020, the BOP issued an update to the phase two COVID-19 action plan. The update reiterated that "[g]enerally, inmate internal movement will be suspended for 30 days" and listed the same above exceptions to the general policy. (Doc. 58-9, BOP Phase 2 Action Plan Update). The March 18, 2020, update also confirmed that the "[a]dmission of newly-committed inmates will continue with appropriate screening as previously directed." (*Id.*). On March 19, 2020, the USMS issued its COVID-19 Detention Guidance. In the section regarding BOP protocol on inmate movement, it again reiterated that "all internal inmate movement" is suspended for 30 days with the same above exceptions applying, and that the [a]dmission of newly-committed inmates (USMS pre-trial and designated prisoners) will continue." (Doc. 58-5, USMS COVID-19 Detention Guidance).

The above policies resulted in a sharp decline in prisoner movement which was illustrated in the OIG report on the USMS and BOP COVID-19 response. Plaintiff points out that in the section of the OIG report explaining what led to the sharp decline, the report states:

> These reductions resulted from factors both internal and external to the USMS. The USMS made reasonable efforts to encourage district offices to scrutinize all movement requests for necessity and discourage district offices from making unnecessary prisoner movements between facilities within the jurisdiction of their district. The courts influenced reduction in prisoner movements by conducting fewer in-person hearings. The BOP also influenced reduction in movements by temporarily ceasing the acceptance of new intakes from the USMS on March 13, 2020. Routine transfers of sentenced prisoners to the BOP resumed on June 30, 2020. As a result, the USMS was able to begin moving the backlog of prisoners awaiting transfers to a BOP facility.

(Doc. 56-1, OIG Report). Scott Kelley, the Assistant Regional Audit Manager for the Department of Justice Office of the Inspector General, who was directly involved in the preparation of the

report, was asked about the above language at his deposition. Mr. Kelley testified the above paragraph was meant to explain some of the factors that contributed to the decrease in prisoner movement. (Doc. 58-10, Kelly Deposition). He also clarified the statement that the BOP "temporarily ceas[ed] the acceptance of new intakes from the USMS" did not mean that the BOP ceased acceptance of "all new intakes," it meant that certain transfers to the BOP that otherwise would have occurred did not occur. (*Id.*). Consistent with this view, Capitan Spencer Smith, the South-Central Regional Health Services Administrator for the BOP testified that the policies permitted the BOP to accept newly-committed inmates as long as they were properly screened. (Doc. 58-6, Smith Deposition). Capitan Smith also clarified that a "newly-committed inmate" includes someone, like Ms. Circle Bear, who has been sentenced and designated to be incarcerated at a BOP facility. (*Id.*).

Plaintiff argues that the policy as of March 13, 2020, mandated that prisoners in USMS custody were only to be transferred to BOP facilities if the transfer was scrutinized for necessity and found to be imperative, and that because Ms. Circle Bear's transfer was not scrutinized for necessity, her transfer violated the policy. However, the evidence presented to the Court does not support that theory. Plaintiff bases her argument on a sentence in the OIG report, not a policy or even an internal agency guideline[2], that states "[t]he USMS made reasonable efforts to encourage district offices to scrutinize all movement requests for necessity." (Doc. 56-1, OIG Report). The language "reasonable efforts to encourage" simply does not direct a mandatory course of conduct. Moreover, all three official policies provided to the Court—the BOP phase two action plan issued on March 13, 2020, the BOP phase two action plan update issued on March 18, 2020, and the

---

[2] The Court notes that the OIG report is an investigatory report aimed at analyzing and discussing the USMS and BOP's COVID-19 response. It is not a mandatory "federal statute, regulation, policy," or an internal agency guideline" that specifically described a course of action to follow. See *Berlovitz*, 486 U.S. at 536; *Gaubert*, 499 U.S. at 324.

USMS detention guidance issued on March 19, 2020—clearly state that the "admission of newly-committed inmates will continue." (Docs. 51-1, BOP COVID-19 Action Plan; 58-9, BOP Phase 2 Action Plan Update; 58-5, USMS COVID-19 Detention Guidance). Although the OIG report states that the BOP "temporarily ceased the acceptance of new inmates from the USMS," Mr. Kelley clarified that it did not mean "all new inmates." (Doc. 58-10, Kelly Deposition). Indeed, the statistics in the report support that conclusion, while there was a significant decrease in prisoner movement during this time, there was never an absolute halt.

Lastly, contrary to Plaintiff's argument, the evidence shows that Ms. Circle Bear was appropriately screened. Plaintiff points to Ms. Circle Bear's medical intake form and argues that because it does not specifically list COVID-19, the screening did not take place. When asked about this at her deposition, Captain Smith testified that upon Ms. Circle Bear's arrival, the nurse practitioner preformed a review of Ms. Circle Bear's medical history and conducted a full physical. (Doc. 58-6, Smith Deposition). Included as part of the larger intake screening, Ms. Circle Bear was screened for COVID-19 symptoms including fever, cough, night sweats, and other respiratory issues. (*Id.*). Thus, Captain Smith testified that even though COVID-19 is not specifically listed, Ms. Circle Bear's medical intake record suggests that she was screened for COVID-19. (*Id.*). But those are common symptoms to look for in any screening, so we do not know that there was a COVID-19 screening nor do we know if the screening personnel had been trained in COVID-19 screening.

Ms. Circle Bear was sentenced to 26 months imprisonment on January 14, 2020, and was designated to FMC Carswell, a BOP facility, on March 3, 2020. Thus, Ms. Circle Bear fit the definition of a "newly-committed inmate." The relevant BOP and USMS policies in force at the time of her transfer on March 20, 2020, clearly permitted the transfer and admission of newly

committed inmates if appropriately screened. Based on the evidence submitted, the Court finds that the transfer of Ms. Circle Bear was a permissible exercise of agency discretion and was consistent with BOP and USMS policy. Further, the Court finds that the decision was involved policy considerations.

To summarize, the Court finds that Count I—the decision to transfer Ms. Circle Bear from Winner City Jail to FMC Carswell: (1) does not form the basis of a plausible claim for deliberate indifference in violation of the Eighth Amendment, (2) did not violate 18 U.S.C. § 4042(a)(2)-(3), and (3) was permissible exercise of agency discretion and consistent with the relevant BOP and USMS policies in force at the time of her designation and transfer. Therefore, the discretionary function exception applies to Count I and the Court lacks subject matter jurisdiction over that claim. Accordingly, Defendants motion to dismiss Count I for lack of subject matter jurisdiction is granted.

### 2. Count II—Manner of Ms. Circle Bear's transfer and conditions of FMC Carswell upon her arrival

#### a. Deliberate indifference

Similar to Count I, Plaintiff argues that the discretionary function exception does not apply to Count II because the manner of Ms. Circle Bear's transfer and the conditions of FMC Carswell upon her arrival amounted to deliberate indifference in violation of the Eighth Amendment. Plaintiff alleges that the government knew about the dangers posed by the pandemic, and in particular to Ms. Circle Bear, and nonetheless were deliberately indifference to that risk. Plaintiff claims that the USMS neglected to take appropriate safety measures during Ms. Circle Bear's transfer to FMC Carswell and that BOP failed to provide a safe environment upon her arrival. Regarding the manner of her transfer, Plaintiff alleges that Ms. Circle Bear was transported on a direct flight with three other prisoners and four USMS employees, and that prior to boarding, they

were asked if they were experiencing any COVID-19 symptoms but were not tested for COVID-19. Further, Plaintiff alleges that during the flight the passengers did not wear masks or practice social distancing. Regarding the conditions of FMC Carswell upon her arrival, Plaintiff claims that the BOP did not provide masks, practice social distancing, or quarantine Ms. Circle Bear individually. Defendant contends that based on what was known during the early stages of COVID-19, the USMS carried out Ms. Circle Bear's transfer in the manner they believed was best suited to minimize her risk of exposure to COVID-19, and that the BOP took reasonable measures at FMC Carswell in attempting the mitigate the spread of COVID-19.

Just as in Count I, it is clear that the USMS and BOP knew of and recognized that Ms. Circle Bear's pregnancy was considered extremely high risk, that COVID-19 was beginning to spread across the United States, and that pregnant women are more susceptible to viral infections. Thus, the question before the Court is whether the USMS and BOP acted with more than gross negligence regarding the manner of Ms. Circle Bear's transfer or how they housed Ms. Circle Bear at FMC Carswell upon her arrival. The Court finds that the manner of the transfer and the measures taken at FMC Carswell in light of the known risks do not amount to more than gross negligence. The Court makes no other finding as to any degree of negligence.

Within 72 hours of Ms. Circle Bear's transfer on March 20, 2020, she was seen by a physician who verified it was safe for her to travel. Prior to boarding, the aircraft was sanitized, each inmate was offered hand sanitizer, and all the passengers were asked if they were experiencing any symptoms of COVID-19 or other contagious illnesses. Plaintiff asserts that the passengers should have been tested for COVID-19 before being transferred and that they should have been provided masks during the transfer. However, rapid COVID-19 tests did not exist at that time, and the tests that did exist took multiple days to return a result and were relatively

unreliable. Moreover, at the time of Ms. Circle Bear's transfer, the CDC's policy on masking was that if you are not sick, you do not have to wear a facemask.

Upon Ms. Circle Bear's arrival to FMC Carswell, she underwent an intake screening, then was placed into a quarantine cell with one other individual with whom she was transported because neither inmate was exhibiting COVID-19 symptoms or were close contacts with known cases of COVID-19. Plaintiff argues that the official BOP policy at the time was that "if space permitted, inmates must be quarantined individually." Plaintiff points to the CDC interim guidance issued March 23, 2020, on the management of COVID-19 in correctional facilities which was adopted by the BOP. However, the portion of the CDC interim guidance that Plaintiff refers to applies to "close contacts." The guidance states "[f]acilities should make every possible effort to quarantine close contacts of COVID-19 individually." (Doc. 56-8, CDC Interim Guidance). The policy for quarantining new intakes who were not exhibiting COVID-19 symptoms and not considered a close contact, as was the case here, stated: "if possible, consider quarantining all new intakes for 14 days...(separately from other individuals who are quarantined due to contact with a COVID-19 case)." (*Id.*). Thus, it appears that the policy did not mandate quarantining new intakes at all, and if the BOP chose to do so, to avoid quarantining new intakes with close contacts. Here, Ms. Circle Bear was quarantined in a cell with one other inmate who was neither a close contact nor symptomatic. The cell was designed to house four inmates, was located in a cell block specifically designated for the quarantine of new intakes and was in close proximity to a nurse station. The cell had a sink, and they were supposed to be provided with soap and a disinfectant to clean their cell. FMC Carswell was also staffed with a sanitation crew who cleaned throughout the prison, although it was not shown how well they cleaned.

28

Plaintiff cites to *Helling v. McKinney* and *Amos v. Taylor* in support of her argument, but neither is convincing. In *Helling*, the United States Supreme Court affirmed the lower court's holding that the prisoner established an Eighth Amendment cause of action where he alleged that prison officials involuntarily exposed him to an unreasonable risk of harm to his future health by assigning him to a cell with another inmate who smoked five packs of cigarettes a day. *Helling v. McKinney*, 509 U.S. 25, 35, 113, S.Ct. 2475, 125 L.Ed.2d 22 (1993). The prison officials in *Helling* could have easily remedied this issue, but consciously chose to ignore his complaints despite knowing that constant exposure to cigarette smoke is likely to cause serious future illness. *Id.* at 33. These actions cannot be equated to what occurred here. Both heavy smoking and COVID-19 present serious health hazards, but the situations are different. In *Helling*, the Defendant could have easily moved the smoker or the non-smoker. They understood risk and could have move him or the nonsmoker, but they did nothing. In the present case, there was no other federal facility for a prisoner with a full-term high-risk pregnancy. There was, however, the non-federal hospital 9 miles away where Ms. Circle Bear was taken and ultimately returned to. Moreover, the heavy smoking hazard was well understood while COVID-19 was a highly contagious virus, and little was known about its method of transmission. At the time in question, it was generally thought that transmission was mainly from surfaces while later on it was learned that transmission was usually airborne. The efforts of the USMS and BOP, though not without fault, contrast clearly with the inaction in *Helling*.

In *Amos v. Taylor*, the court denied the plaintiff's request for injunctive relief holding that the inmates were unlikely to succeed on the subjective prong of the deliberate indifference claim. *Amos v. Taylor*, 20-7-DMB-JMV, 2020 WL 1978382 at *10 (N.D. Miss. Apr. 24, 2020). The Court explained that defendants took steps to mitigate the risks of COVID-19, and even though

29

some of the policies conflicted with CDC Guidance and the implementation of the policies was inconsistent or ineffectual, there was no showing that the officials subjectively believed the measures they were taking were inadequate. *Id.* at 11. The court also analogized the facts to *Valentine v. Collier*, a Fifth Circuit case which also held that the plaintiffs were unlikely to establish the subjective prong of deliberate indifference because there was no evidence that the officials subjectively believed the measures they took were inappropriate, and "[a]lthough the district court might do things differently, mere 'disagreement' with [the prison's] medical decisions does not establish deliberate indifference." *Id.* (quoting *Valentine v. Collier*, 956 F.3d 979, 802-03 (5th Cir. 2020)).

In the instant case, like *Amos* and *Valentine*, the USMS and BOP took numerous steps in attempting to mitigate the spread of COVID-19 and updated their policies as the understanding of COVID-19 evolved. Prior to transporting Ms. Circle Bear, the USMS sanitized the aircraft, screened the passengers, and provided hand sanitizer. At FMC Carswell, the BOP halted visitation, reduced the movement of prisoners in and out of the facility, had separate quarantine procedures in place for new inmates, symptomatic inmates, and close contacts, screened employees and new inmates, and provided extra soap and disinfectant. While there is some evidence that masks were not provided to inmates, and social distancing was not strictly enforced, that is not enough to form the basis of a plausible claim of deliberate indifference. *See Id.* ("While elements of [the prison's] protocols appear to conflict with a handful of provisions in the CDC Guidance...these departures are insufficient on their own to show...deliberate indifference."). The evidence does not show the USMS or the BOP acted with more than gross negligence in deciding how to transfer and house Ms. Circle Bear. The Court makes no other finding as to any degree of

negligence. Accordingly, the Court finds that Count II does not form the basis for a plausible claim of deliberate indifference in violation of the Eighth Amendment.

### b. Statutory violation under 18 U.S.C. § 4042(a)(2)-(3)

Similar to Count I, Plaintiff alleges that by failing to take any COVID-19 safety measures during Ms. Circle Bear's transfer, and by exposing her to conditions at FMC Carswell which Plaintiff alleges were unsafe for a woman in her condition, the USMS and BOP failed to comply with their statutory duties to "provide suitable quarters" under § 4042(a)(2), and "provide for [her] protection" under § 4042(a)(3). 18 U.S.C. § 4042(a)(2)-(3). The Court already explained above that while § 4042 sets forth various duties of the USMS and the BOP, it does not prescribe a mandatory course of action as to how the BOP are to carry out those duties, thus triggering the discretionary function exception. *See Muick*, 83 Fed.Appx. at 853 ("§ 4042 reserves to the BOP sufficient discretion in how it fulfills its section 4042 duties to trigger the discretionary-function exception."); *Dudley*, 2010 WL 5290024, at *3 (holding that medical classification of inmates and institutions, as well as determinations of the method for transporting inmates, are discretionary decisions not subject to any specific mandate by § 4042); *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) ("The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."); *Cohen v. United States*, 151 F.3d 1338, 1342–43 (11th Cir. 1998) ("§ 4042 leaves BOP personnel sufficient discretion about how their § 4042 duty of care is to be accomplished to warrant application of the discretionary function exception.").

Plaintiff relies on the same theory asserted in Count I. Plaintiff concedes that § 4042 allows discretion as to how the USMS and the BOP fulfill its § 4042 duties and agrees that § 4042 is not violated when the BOP attempts, but fails, to protect prisoners, but argues that because the

government failed to take even a "minimal level of precaution" to protect Ms. Circle Bear both during her transfer and once she arrived at FMC Carswell, it violated § 4042(a)(2)-(3) and thus the discretionary function exception is inapplicable. Again, even if the Court were to accept Plaintiff's argument, the present facts do not support a finding that the BOP or the USMS "failed to take even a minimal level of precaution." As the Court just described above, the USMS certainly took more than a minimal level of precaution to protect Ms. Circle Bear before and during her transfer. Prior to her transfer, Ms. Circle Bear was cleared by a physician to travel, the USMS sanitized the aircraft, screened the passengers for COVID-19 symptoms, and provided hand sanitizer. Likewise, the BOP took more than a minimal level of precaution at FMC Carswell in attempting the mitigate the spread of COVID-19. The BOP halted visitation, reduced the movement of prisoners in and out of the facility, had quarantine procedures in place for new inmates, symptomatic inmates, and close contacts, screened employees and new inmates, and provided extra soap and disinfectant.

As is the case here, when a statute does not direct a specific course of action, and the employee's actions are "considered a product of judgment or choice," the discretionary function exception shields the government from liability "whether or not the discretion involved be abused." In carrying out its duties under § 4042, the USMS exercised its discretion as to how it would transfer Ms. Circle Bear and how it would house her once she arrived. These decisions are consistent with the plain language of § 4042. Of course, one could argue that the USMS and BOP could have attempted to fulfill its duties differently or more completely, however, that is not for the Court to decide, and the facts before the Court simply do not support a finding that in attempting to fulfill their § 4042 duties, the USMS and the BOP failed to take even a minimal level of precaution. Therefore, the Court finds that the manner of Ms. Circle Bear's transfer and the conditions upon her arrival at FMC Carswell did not violate § 4042.

### c. BOP and USMS COVID-19 Policies

Finally, Plaintiff argues that the discretionary function exception is inapplicable to Count II because the manner of Ms. Circle Bear's transfer and the conditions of FMC Carswell upon her arrival violated USMS and BOP policies in force at that time. In particular, Plaintiff argues that the CDC interim guidance issued on March 23, 2020, mandated BOP officials to quarantine newly arriving inmates individually (if space provided) and to provide masks to inmates. Further, that the BOP phase two action plan issued on March 13, 2020, and updated on March 18, 2020, mandated enhanced screening of newly arriving inmates. Plaintiff argues these polices were not followed and thus the discretionary function exception is inapplicable. Defendant argues that the policies listed in the CDC interim guidance were only recommendations and thus were not binding on the USMS or BOP, and even if they were, the polices left room for discretion and did not mandate a specific course of performance. Moreover, while Defendant does not dispute the screening policy was mandatory, it contends that Ms. Circle Bear was appropriately screened.

For the purposes of this motion, the Court agrees with Plaintiff in that although the March 23, 2020, CDC Interim Guidance began as a mere recommendation, once the BOP decided as a policy matter to adopt those recommendations, it became BOP policy. The Court has already listed some of the relevant polices above but will repeat them here for the sake of clarity. First, as far as the Court can tell, the only agency policy relevant to the manner of Ms. Circle Bear's transfer is that pregnant inmates receive approval from an obstetrician with 72 hours of transportation, (Doc. 9-1, USMS Transportation Directives), and neither party disputes that the USMS obtained the required approval. Plaintiff argues that masks should have been provided to Ms. Circle Bear and the other passengers during their transportation to FMC Carswell, however, at the time of her transfer, there was no mandatory masking policy in place. Besides requiring physician approval,

which was obtained here, it is apparent that the policies in place at the time of Ms. Circle Bear's transfer allowed for discretion regarding the manner of her transfer, thus triggering the discretionary function exception. Moreover, it is clear that decisions about whether to implement particular COVID-19 measures are grounded in public policy considerations including the safety of inmates, staff, and allocation of resources. Therefore, the Court finds that the decisions made by the USMS regarding the manner of Ms. Circle Bear's transfer is shielded by the discretionary function exception.

As to the conditions of FMC Carswell upon Ms. Circle Bear's arrival, it is clear that both the March 13, 2020, and the March 18, 2020, BOP phase two action plans state that "[a]ll newly-arriving inmates are screened for COVID-19 exposure risk factors and symptoms." (Docs. 51-1, BOP COVID-19 Action Plan; 58-9, BOP COVID-19 Action Plan Update). Further, "[a]symptomatic inmates with exposure risk factors are to be quarantined," and "[s]ymptomatic inmates with exposure risk factors are to be isolated and tested for COVID-19." (*Id.*). The March 23, 2020, CDC interim guidance provides some clarity on the quarantine policies and outlines the different procedures to follow based on whether the individual is symptomatic, a close contact, or a new intake.

Relevant to newly arriving inmates the guidance states "[i]f possible, consider quarantining all new intakes for 14 days before they enter the facilities general population (separately from other individuals who are quarantined due to contact with a COVID-19 case)." (Doc. 56-8, CDC Intermit Guidance). The CDC guidance further states that "facilities may choose to quarantine all new intakes for 14 days…as a general rule (not because they were exposed to a COVID-19 case). (*Id.*). "Under this scenario, avoid mixing [with] individuals quarantined due to exposure." (*Id.*). Regarding symptomatic individuals, the guidance provides that individuals presenting COVID-19

symptoms "should wear a face mask" and "should be immediately placed under medical isolation individually." (*Id.*). The CDC guidance defined a symptomatic individual as someone who is exhibiting COVID-19 symptoms including "fever, cough, and shortness of breath." (*Id.*). And finally for close contacts, "[f]acilities should make every possible effort to quarantine close contacts of COVID-19 cases individually." (*Id.*). The CDC guidance defines "close contact" as an individual who has "been within approximately 6 feet of a COVID-19 case for a prolonged period of time or have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on)." (*Id.*).

First, the Court has already found that Ms. Circle Bear was adequately screened. Not only was she and all the other passengers screened for COVID-19 symptoms prior to boarding the aircraft to FMC Carswell, but she was also screened upon her arrival. Even though her medical intake record does not specifically list COVID-19, the nurse practitioner who screened Ms. Circle Bear conducted a full physical which included COVID-19 symptoms such as fever, cough, night sweats, and other respiratory issues. Captain Smith's testimony confirmed that even though COVID-19 is not specifically listed, Ms. Circle Bear's medical intake record suggests that she was screened for COVID-19. (Doc. 58-6, Smith Deposition). Next, Plaintiff's argument that the CDC guidance mandated BOP officials to quarantine newly arriving inmates individually (if space provided) is simply incorrect. Nowhere in the CDC guidance does it mandate that new intakes be quarantined individually. In fact, the CDC guidance does not even mandate that new intakes be quarantined at all. It states, "*consider* quarantining new intakes" and "facilities *may choose* to quarantine all new intakes." (Doc. 56-8, CDC Intermit Guidance). The only individuals that were to be quarantined individually were "close contacts" and "symptomatic" individuals. Here, upon their arrival and placement in quarantine, neither Ms. Circle Bear, nor her cell mate were

35

"symptomatic" or "close contacts." Thus, by deciding to quarantine Ms. Circle Bear, the BOP actually went beyond the protections required by the CDC guidance. Likewise, the provisions of the CDC guidance that require masking only apply to close contacts and symptomatic individuals, and thus were not required for Ms. Circle Bear.

Based on the information submitted to the Court, the USMS and BOP did not violate any mandatory agency policies in force at that time. The BOP and USMS were exercising their authorized discretion regarding the manner of Ms. Circle Bear's transfer, her quarantine, and other measures that were implemented at FMC Carswell aimed at mitigating the spread of COVID-19. Once it has been established that the regulatory scheme allows discretion, "a presumption arises that the discretion is grounded in policy considerations." *Buckler*, 919 F.3d at 1046 (quoting *Hernden*, 726 F.3d at 1048)). Here, the BOP's decisions about whether to implement particular infectious disease measures at FMC Carswell were grounded in public policy considerations including the need to provide for the safety and security of all inmates at the prison, BOP staff, and the public; how to best allocate resources including money, manpower, and limited personal protective equipment; and the potential impact of any measure on the orderly running of the prison. Therefore, the Court finds that the manner of Ms. Circle Bear's transfer and the conditions at FMC Carswell upon her arrival were permissible exercises of agency discretion and consistent agency policy.

To summarize, the Court finds that Count II—the manner of Ms. Circle Bear's transfer and the conditions of FMC Carswell upon her arrival—(1) does not form the basis of a plausible claim for deliberate indifference in violation of the Eighth Amendment, (2) did not violate 18 U.S.C. § 4042(a)(2)-(3), and (3) was a permissible exercise of agency discretion and consistent with the relevant BOP and USMS policies in force at the time of her transfer and arrival to FMC Carswell.

Therefore, the discretionary function exception applies to Count II and the Court lacks subject matter jurisdiction over that claim. Accordingly, Defendant's motion to dismiss Count II for lack of subject matter jurisdiction is granted.

### 3. Count III—Failure to provide adequate medical care

Unlike Counts I and II, the government moves to dismiss Count III pursuant to 12(b)(6) on the basis that Texas law shields it from liability. Defendant argues that because the United States' immunity under Texas law is apparent on the face of the complaint, dismissal is appropriate. *See Burlison v. United States*, 627 F.2d 119, 122 (8th Cir. 1980) ("Although it may be unusual to uphold an affirmative defense at the pleading stage, when the defense is established on the face of the complaint, dismissal is appropriate."). Plaintiff argues that the government's assertion of the Texas pandemic-immunity law is procedurally improper, and even if it is not, the Texas immunity law does not shield the misconduct alleged here.

In relevant part, the statute provides:

> Except in a case of reckless conduct or intentional, willful, or wanton misconduct, a physician, health care provider, or first responder is not liable for an injury, including economic and noneconomic damages, or death arising from care, treatment, or failure to provide care or treatment relating to or impacted by a pandemic disease…if the physician, health care provider, or first responder proves by a preponderance of the evidence that: (1) a pandemic disease…was a producing cause of the care, treatment, or failure to provide care or treatment that allegedly caused the injury or death; or (2) the individual who suffered injury or death was diagnosed or reasonably suspected to be infected with a pandemic disease at the time of the care, treatment, or failure to provide care or treatment.

Tex. Civ. Prac. & Rem. Code Ann. § 74.155(b)(1)-(2). The statute clearly provides that it is defendant's burden to prove the applicability of the affirmative defense. The statute also includes a procedural provision which states that a defendant "who intends to raise a defense under [§ 74.155(b)] must provide to a claimant specific facts that support an assertion" either under subsection (b)(1) or (b)(2), and requires that a defendant provide the specific facts within a

specified number of days after the defendant files an original answer to the complaint or after the plaintiff serves her expert report. *Id.* § 74.155(g). Thus, by placing the burden on the defendant to provide specific facts which prove the applicability of the statute and listing the timeline for doing so as after the defendant answers, the statute demonstrates that it is not designed to be ruled on at the pleading stage. *See Layne v. Esplanade Gardens Senior, Inc.*, No. 21-558, 2022 WL 14225362, at *3 (W.D. Tex. Oct. 24, 2022) ("To the extent that Defendants believe that they have [a defense under § 74.155], such defenses do not affect whether Plaintiffs have sufficiently pled causes of action for negligence and gross negligence. Any such defenses cannot be attacked under Fed. R. Civ. P. 12(b)(6), but rather by way of a motion for summary judgment."). Here, there are numerous fact issues that must be addressed before determining whether the Texas pandemic-immunity law applies, many of which most likely require expert opinion. The court notes that reckless conduct is excluded from the protections of the statute. Therefore, while the Court accepts the Government's assertion of the affirmative defense, as it will presumably be raised in Defendant's answer, it will not rule on whether it applies to the conduct alleged in Count III at this time. Accordingly, Defendant's motion to dismiss Count III pursuant to 12(b)(6) is denied.

## III.    CONCLUSION AND ORDER

For the reasons stated above, it is hereby ORDERED that:

1. Defendant's motion to dismiss Count I of Plaintiff's complaint based on a lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) is granted;

2. Defendant's motion to dismiss Count II of Plaintiff's complaint is granted based on a lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) is granted; and

3. Defendant's motion to dismiss Count III of Plaintiff's complaint based on a failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) is denied.

DATED this 27 day of March, 2025.

BY THE COURT:

LAWRENCE L. PIERSOL
United States District Judge